# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

In the Matter of the Search of　　　　　　）
*(Briefly describe the property to be searched*　）
*or identify the person by name and address)*　）
SAMSUNG GALAXY NOTE 9, IMEI 356568090054491,　）
SAMSUNG GALAXY S8, IMEI 355987080841710;　）
SAMSUNG GALAXY S9, IMEI 354824090452520　）

Case No. 19-125-M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*
See Attachment A

located in the _____ Eastern _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U S C. 846 | Conspiracy to distribute heroin, Possession with intent to distribute controlled |
| 21 U S C 841(a)(1) | substances, Possession of a firearm in furtherance of a drug trafficking crime |
| 18 U S C 924(c) | |

The application is based on these facts:
See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Anthony Ilardi, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: JAN. 24, 2019

_____
*Judge's signature*

City and state: Philadelphia, PA _____

Hon. David R. Strawbridge, U.S. Magistrate Judge
*Printed name and title*

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SAMSUNG GALAXY NOTE 9, INTERNATIONAL MOBILE EQUIPMENT IDENTITY (IMEI) 356568090054491; SAMSUNG GALAXY S8, IMEI 355987080841710; SAMSUNG GALAXY S9, IMEI 354824090452520; CURRENTLY LOCATED AT FEDERAL BURUEAU OF INVESTIGATION, PHILADELPHIA DIVISION, EVIDENCE CONTROL ROOM | Case No. __19-123-M__ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Anthony J. Ilardi, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from those properties of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May 2008. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. As part of my duties with the FBI, I investigate violations of federal criminal law over which the FBI has jurisdiction, including violent crimes, gangs, drug trafficking organizations and other violent criminal elements. Over the course of these investigations, I have interviewed witnesses, conducted physical surveillance, monitored the use of human sources, made

1

consensually monitored recordings, and utilized other investigative techniques. I have participated in searches authorized by consent, search warrants, and other legal grounds, for residences, businesses, cellular phones, and vehicles for the purpose of obtaining evidence. I have applied for and received search and seizure warrants.

3.      As part of my duties as an FBI Special Agent, I investigate how Drug Trafficking Organizations ("DTO") transport controlled substances and drug trafficking instrumentalities, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846. I have been trained in various aspects of law enforcement, including the investigation of narcotics offenses.

4.      Based on my training, knowledge and experience, as well as the training, experience and knowledge of other officers and agents, I have learned the following in connection with investigating those involved in illegal trafficking of controlled substances and detection of dealing in proceeds of unlawful activity: Individuals involved in illegal activity and drug dealing commonly maintain addresses or telephone numbers in books or papers or in cellular telephones which reflect names, addresses and/or telephone numbers of their associates in the illegal organization and/or individuals involved in their narcotics and money laundering activities; individuals involved in narcotics trafficking frequently list drug associates on cellular phone directories, often by nickname or code, to avoid detection by law enforcement and other individuals who would able to identify them; and a review of a telephone's directory is one of the few ways to verify the numbers (that is, the cellular phones, pagers, etc.) being used by specific targets, conspirators, and associates; individuals involved in narcotics trafficking often utilize multiple cellular phones to attempt to conceal their identity, avoid detection by law enforcement and to facilitate their drug trafficking activities. I also know that drug traffickers frequently use cellular telephone functions, such as text-messaging, email and voice communications, to

communicate with other co-conspirators, buyers and suppliers in furtherance of their drug trafficking activities. Often, drug traffickers use multiple cellphones for their drug trafficking, in an effort to conceal their phone contact numbers and illegal activities from law enforcement and other individuals.

5.     The information contained in this affidavit is based upon my personal observations and investigation, information relayed to me by other special agents and/or other law enforcement agents, as well as official reports of law enforcement. Because this affidavit is being submitted for the limited purpose of securing authorization to search cellular telephones, I have not included every fact to me concerned this investigation.

6.     This affidavit requests the search of the property listed in Attachment A and the extraction from that property of electronically stored information as described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.     The properties to be searched are a SAMSUNG GALAXY NOTE 9, INTERNATIONAL MOBILE EQUIPMENT IDENTITY (IMEI) 356568090054491; SAMSUNG GALAXY S8, IMEI 355987080841710; SAMSUNG GALAXY S9, IMEI 354824090452520 , hereinafter the "Devices." The Devices are currently located at the Federal Bureau of Investigation, Philadelphia Division, Evidence Control Room.

8.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

9.     As set forth below, there is probable cause to believe that the Devices contain evidence, fruits, and instrumentalities of crimes against the United States occurring in this judicial district, specifically, violations of Title 21, United States Code, Section 841(a)(1), (distribution and possession with the intent to distribute controlled substances), and Title 18

United States Code, Section 2, (aiding and abetting the possession of a controlled substance with the intent to distribute).

**PROBABLE CAUSE**

1.      A partial list of the individuals involved in what will be referred to as the NEGRIN Drug Trafficking Organization or DTO are as follows:

- **ROBERTO DEJESUS NEGRIN**[1] supplies the heroin to the NEGRIN DTO and is believed to arrange for the transportation of the heroin from New York to Philadelphia;

- **STALIN DEJESUS MARTE**[2] is believed to be involved in the preparation of the bulk heroin for street sales as well as arranging for the transport of kilogram quantities of heroin from New York to Philadelphia;

- **FRANCISCO CRUZ-MARTE** is believed to be involved in the preparation of the bulk heroin for street sales;

- **NOEL DE AZA ARIAS** is believed to be involved in preparation of the bulk heroin for street sales; and

- **CHRISTIAN DE AZA ARIAS** is believed to be involved in preparation of the bulk heroin for street sales.

The locations in Philadelphia involved in the NEGRIN DTO are as follows:

- 1339 Robbins Street, Philadelphia, PA 19111 ·· this location is believed to be where the bulk heroin is prepared for street sales;

---

[1] NEGRIN was indicted by a federal grand jury on December 13, 2018.
[2] Stalin DeJesus MARTE, Francisco Cruz MARTE, and Noel De Aza ARIAS were indicted by a federal grand jury on January 10, 2019. Christian De Aza ARIAS has not been charged.

4

- 3934 and 3936 K Street, Philadelphia, PA 19134 – these locations are believed to be stash houses where kilograms of heroin come in from New York and are stored until they are transported up to Robbins Street.

The above individuals and locations are referenced in the paragraphs that follow.

2.     On October 30, 2018, the Honorable Gerald A. McHugh, United States District Judge for the Eastern District of Pennsylvania, issued an Order authorizing the interception for thirty days of wire and electronic communications over the NEGRIN's phone.

3.     On November 10, 2018, at approximately 2:58 p.m., agents intercepted an outgoing call from NEGRIN's phone, to 646-719-3072, utilized by MARTE.[3] The following is an excerpt of the conversation:

| MARTE: | [UI] |
|---|---|
| NEGRIN: | Hello. |
| MARTE: | Talk to me. |
| NEGRIN: | And that number that you called me from? |
| MARTE: | What? |
| NEGRIN: | Just now, the number from which you called me, whose number is that? |
| MARTE: | It's the one I use to talk to my ladies. |
| NEGRIN: | Okay. Yeah. What was I going to say to you? What was it I wanted to say? Did you talk with the kid? |
| MARTE: | No, I'm going to stop by here. Because he lives, I'm nearby his house. |

---

[3]     All of the transcribed calls included in this affidavit were entirely in Spanish. An FBI linguist monitored the call and provided a written summary of the call. After your affiant assessed the contents of the calls and determined that they were pertinent to the investigation, an FBI Spanish linguist completed a verbatim transcription of the call.

| | |
|---|---|
| NEGRIN: | Okay. You reach an agreement, because you do what you have to do. You know? Because later if you say "No, tomorrow", then something comes up, and if you say "Today", and something comes up and then it doesn't get done. You understand? |
| MARTE: | And how many, how many women are there? |
| NEGRIN: | I don't know. |
| MARTE: | Because he said, he'd go to ask how many women you were going to want. |
| NEGRIN: | Well, he didn't call me or anything. What he told me was that he was going to see how many he could get for me. |
| MARTE: | Oh... |
| NEGRIN: | But if its good, I don't care, he can get me whatever, what do you say? |
| MARTE: | Uh, yeah but if he, if he gets you at least two or three, at least until his get here, you know his are cheaper. |
| NEGRIN: | Yeah. [Phone ringing] Of course. |
| MARTE: | That's all. |
| NEGRIN: | Yeah, that's all, you call me once you talk with him. |
| MARTE: | Sure, will do. |

Based on my training and experience, and knowledge of this investigation, I believe that in the above intercepted call, NEGRIN calls MARTE to discuss NEGRIN receiving a re-supply of heroin from an individual known as "Shorty." MARTE asks NEGRIN how many "women" he will get from "Shorty". Your affiant knows that "women" is used in this instance as a code for kilograms of heroin. NEGRIN replies that he doesn't care how many kilograms of heroin he gets from "Shorty;" he just wants to make sure the quality is good. MARTE suggests that NEGRIN

take "at least two or three" for now because Shorty's regular shipment of heroin is on the way and his kilograms of heroin are cheaper. NEGRIN agrees.

4.     On November 11, 2018, at approximately 11:37 a.m., agents intercepted an outgoing call from NEGRIN's phone, to 646-719-3072, utilized by MARTE. The following is an excerpt of the conversation:

| NEGRIN: | Who was that, [UI]? |
| MARTE: | Talk to me, mad man. |
| NEGRIN: | What's going on, mad man? |
| MARTE: | We're just leaving. |
| NEGRIN: | But have you crossed the bridge yet? |
| MARTE: | No, he must have crossed it because he'd already been driving |
| NEGRIN: | ˙ Did he leave a long while ago? |
| MARTE: | About, about fifteen, fifteen or twelve ago. |
| NEGRIN: | Oh, okay.  What was I going to say?  With two passengers, right? |
| MARTE: | He, he said he was going to go with three. |
| NEGRIN: | With three? |
| MARTE: | Uh-huh. |
| NEGRIN: | And did Shorty check it over there? |
| MARTE: | [UI] And I told you that there was one that was like, like it was a little, a little darker? |
| NEGRIN: | Uh-huh. |
| MARTE: | That's why there are two. |

7

| NEGRIN: | Alright. No, that's fine then. No, I didn't check it. |
| MARTE: | Check it, because there are two that are the same, identical. There's one that is a little darker. |
| NEGRIN: | Oh, because the two, the two that I checked first were the ones that were the same. So check, check those today, and see. |

Based on my training and experience, and knowledge of this investigation, I believe that during the above intercepted call, MARTE is on his way down to Philadelphia from New York to facilitate the delivery of heroin to NEGRIN. Based on the conversation and subsequent surveillance conducted by members of the FBI, MARTE drove separately from the individual(s) who brought the heroin down from New York. MARTE tells NEGRIN that the courier has three passengers with him. Your affiant believes that MARTE is using "passengers" as code to refer to three kilograms of heroin, which the courier is delivering to NEGRIN. MARTE tells NEGRIN that one of the kilograms is darker in color than the other two and that NEGRIN should check that one to make sure it is good.

5. On November 11, 2018, at approximately 1:31 p.m., agents intercepted an outgoing call from NEGRIN's phone, to 347-961-5016, utilized by CRUZ-MARTE. The following is an excerpt of the conversation:

| CRUZ-MARTE: | Talk to me, madman. |
| NEGRIN: | Did that guy talk to the kid? |
| CRUZ-MARTE: | Yes. [UI] |
| NEGRIN: | Okay. |
| CRUZ-MARTE: | Um-hm. |
| NEGRIN: | No, what he has to do is - - |
| CRUZ-MARTE: | Um-hm. |

8

| NEGRIN: | What do you think if we go to the basement? |
| --- | --- |
| CRUZ-MARTE: | Yeah, better. |
| NEGRIN: | Like if Stalin [MARTE] leaves the SUV there and we head to the basement. |
| CRUZ-MARTE: | Okay, uh-huh. |
| NEGRIN: | Stalin can leave the car there and we can put the tickets in and then all he has to do is leave. |
| CRUZ-MARTE: | Exactly, no problem. |
| NEGRIN: | Check to see if there's parking in the basement, would you? |
| CRUZ-MARTE: | I'll walk over there and see, and I'll call you. |
| NEGRIN: | Alright. |
| CRUZ-MARTE: | Um-hm... |

Based on my training and experience, and knowledge of this investigation, I believe, at the time of this call, MARTE and CRUZ-MARTE have arrived in Philadelphia and, in the above intercepted call, NEGRIN calls CRUZ-MARTE to coordinate where they will meet to transfer the heroin from the courier to NEGRIN and the money from NEGRIN to the courier. In the call, Negrin refers to MARTE by his first name, Stalin.

6. On November 11, 2018, at approximately 1:45 p.m., the FBI established surveillance in the area of 3936 K Street, one of the suspected stash house locations used by the NEGRIN DTO. During this surveillance, FBI Task Force Officer Joe Domico observed NEGRIN driving a silver colored Mazda SUV, JVL-2423. NEGRIN parked in front of 3944 K Street, exited the vehicle and entered the driver's seat of a black Mercedes that was double-parked in front of 3936 K Street. NEGRIN then left the area in the Mercedes. A short time thereafter, a dark colored Mazda with New York registration, operated by a Hispanic male with short hair and a beard, pulled

9

up in front of 3936 K Street. A Hispanic female exited 3936 K Street and entered the passenger side of the dark colored Mazda. The female exited the Mazda several minutes later with a bag and went back into 3936 K Street. At approximately 2:03 p.m., NEGRIN called CRUZ-MARTE and told him to be on the lookout because he was entering the alley. He then told CRUZ-MARTE to "bring that." Surveillance units observed NEGRIN drive into the rear alley behind the 3900 block of K Street in the silver Mazda. A Hispanic male exited the rear of 3936 K Street with an object in his hand and entered the passenger side of the Mazda. The Mazda then left the area. Approximately ten minutes later, e-911 precision location information placed NEGRIN's phone inside 1339 Robbins Street, Philadelphia, PA. Based on my training and experience, and knowledge of this investigation, I believe this was the delivery of the heroin that NEGRIN and MARTE had discussed in intercepted calls earlier in the day.

7. On November 18, 2018, at approximately 7:04 p.m., agents intercepted an outgoing call from NEGRIN's phone, to 646-719-3072, utilized by MARTE. NEGRIN tells MARTE that he is on his way to pick him up. E-911 precision location information revealed that at the time of the call MARTE was inside 1339 Robbins Street. Shortly thereafter, e-911 precision location information revealed that NEGRIN was in the vicinity of 1339 Robbins Street. Approximately fifteen minutes later, e-911 precision location information revealed that both NEGRIN and MARTE were in the vicinity of 3936 K Street. Within thirty minutes of the pings at 3936 K Street, e-911 precision location information placed NEGRIN back in the vicinity of his residence, 2024 Ripley Street, and MARTE back in the vicinity of 1339 Robbins Street.

8. On November 19, 2018, at approximately 9:09 p.m., agents intercepted an outgoing call from NEGRIN's phone, to 917-495-1427, utilized by Noel ARIAS. The following is an excerpt of the conversation:

10

| | |
|---|---|
| NEGRIN: | How--how many machines did you make dance today? |
| Noel ARIAS: | I--uh...the--the 13. |
| NEGRIN: | And... how many came out today? |
| Noel ARIAS: | It was good today. Today it was 1,120. [clears throat] [noise CONSPIRATOR 4 in the background] |
| NEGRIN: | [OV] And yesterday? |
| Noel ARIAS: | The same. |
| NEGRIN: | I see. |
| Noel ARIAS: | M-hm. |
| NEGRIN: | I see. |
| Noel ARIAS: | There--because, these--these are coming out like [UI]--the boxes have a little more. |
| NEGRIN: | Yes. No, but that's fine— |
| Noel ARIAS: | [OV] [UI] the other time--the other time one thousand ten-- one thousand one hundred ten, one thousand five were coming out. And now one thousand one hundred twenty are coming out. |
| NEGRIN: | Oh, that's fine. |
| Noel ARIAS: | But [UI]— |
| NEGRIN: | [OV] What was I going to say to you? |
| Noel ARIAS: | [OV] But [UI]— |
| NEGRIN: | How--how many are made total? |
| Noel ARIAS: | [coughs] Mm... no--no, what was made yesterday and today. |
| NEGRIN: | One thou--one thousand... two thous--[UI]— |
| Noel ARIAS: | [OV] [UI] thousand--two thousand [UI] |

11

| NEGRIN: | --and [UI]; there are two thousand three hundred; we could say that. Yes— |
| Noel ARIAS: | [OV] Yes, that's what we were seeing there, but... |
| NEGRIN: | There are...for example, today is Tues--today is Monday; he has the one for Tuesday. And Wednesday, Thursday, Friday and Saturday are there... |
| Noel ARIAS: | M-hm. |
| NEGRIN: | [OV] And part of Sunday; but let's not count that part. Let's count Wednesday, Thursday, Friday, Saturday...uh, there it is. Until Tue--Wednesday, Thursday, Friday and Saturday and whatever you guys do tomorrow, is Sunday and Monday. We have to work on Wednesday. |
| Noel ARIAS: | [coughs] There you have it. |

9. Based on my training and experience, and knowledge of this investigation, I believe NEGRIN calls Noel ARIAS, a bagger for his heroin distribution organization, to check on the status of the bagging operation. Noel ARIAS tells NEGRIN how many bundles of heroin were bagged up on Sunday and Monday. NEGRIN then tells Noel ARIAS that "he has the one for Tuesday". Your affiant believes, based on other intercepted calls as well as NEGRIN and MARTE's trip to 3936 K Street, that NEGRIN is telling Noel ARIAS that MARTE has the third kilogram of heroin and that they should bag that up Tuesday and Wednesday. Your affiant further believes that NEGRIN and MARTE drove down to get the third kilogram from K Street earlier that evening.

10. Physical surveillance over the course of the investigation has demonstrated that 1339 Robbins Street is a residence that is not continuously occupied. It appears that the residence only has individuals within it when they are present to prepare heroin for street sales. This has been corroborated by electronic surveillance in that the residence is used only around the time that the electronic surveillance reveals that a shipment of heroin has arrived in Philadelphia.

11.     On November 11, 2018, at approximately 4:00 p.m., a Philadelphia Police Department marked patrol unit stopped NEGRIN's silver Mazda SUV for excessive tint. PPD Officers identified NEGRIN as the driver and MARTE and CRUZ-MARTE as passengers in the Mazda. After confirming the registration for NEGRIN's vehicle, PPD officers let the Mazda go. The Mazda was then followed to 2024 Ripley Street, NEGRIN's residence, where all three men exited the Mazda and entered the residence. Surveillance was terminated at this point.

12.     On November 12, 2018, at approximately 11:52 a.m., agents intercepted an outgoing call NEGRIN's phone, to 646-719-3072, utilized by MARTE. The following is an excerpt of the conversation:

| | |
|---|---|
| NEGRIN: | Hey, is Lele there? |
| MARTE: | Yes. |
| NEGRIN: | Put Lele on the phone. [Pause] |
| CRUZ-MARTE: | What, faggot? |
| NEGRIN: | Lele! |
| CRUZ-MARTE: | Uh-huh. |
| NEGRIN: | Go knock on Dario's door. |
| CRUZ-MARTE: | He's not there. |
| NEGRIN: | He's not there? And the woman's not there? |
| CRUZ-MARTE: | Huh-uh. They go out and they get back late. |
| NEGRIN: | And the wife, was she there? |
| CRUZ-MARTE: | Uh-huh. The woman gets up really early, and gets home later than he does, like at 6:30. |
| NEGRIN: | Alright |
| CRUZ-MARTE: | From her work. So you know. |

| NEGRIN: | You know it. |
| CRUZ-MARTE: | What's going on? |
| NEGRIN: | I came over here early, to check on the house and I'm parked, looking at the area, you see. |
| CRUZ-MARTE: | Oh. [mumbles] and there's nothing going on? |
| NEGRIN: | I'm here since six in the morning. |
| CRUZ-MARTE: | Jesus mighty! [Laughs ] [Coughs] |
| NEGRIN: | [OV] [UI] If you don't see any - - That car came out from a different place, you know what I mean? |
| CRUZ-MARTE: | No, but just in case. |
| NEGRIN: | But if I don't look out for you, who will? |
| CRUZ-MARTE: | That's correct. |
| NEGRIN: | You know what I mean. |
| CRUZ-MARTE: | Uh-huh. |
| NEGRIN: | Because you know, your turn around ·· we go to the supermarket, a turn here and a turn here a turn there and that car came out of nowhere. |
| CRUZ-MARTE: | Yeah and they're there. |
| NEGRIN: | And that car wasn't, wasn't following us, either, you know? |
| CRUZ-MARTE: | No...no, no. |
| NEGRIN: | [OV] But if there's food, if there's food that's already prepared, what need is there for us to force ourselves to work? |
| CRUZ-MARTE: | Exactly, uh-huh. |
| NEGRIN: | So what I'm thinking is that, you should leave and if anything, you come back on Thursday. |
| CRUZ-MARTE: | However you want. |

14

| | |
|---|---|
| NEGRIN: | Because, because there's food left there. There's a thousand left, right? There are two bags left? |
| CRUZ-MARTE: | Um-hm. |
| NEGRIN: | And there's like one thousand five hundred left up there. |
| CRUZ-MARTE: | Okay. |
| NEGRIN: | And that for Thursday for sure. |
| CRUZ-MARTE: | Um-hm. |
| NEGRIN: | You understand, but it's that you, you have to be careful. |
| CRUZ-MARTE: | Of course. |
| NEGRIN: | I know that the house is fine, you know what I mean, but what do you say? |
| CRUZ-MARTE: | Um-hm. Okay. |
| NEGRIN: | Dude, there are cops crossing this street all the time – patrol cars. |
| CRUZ-MARTE: | Are you in your car? |
| NEGRIN: | Yeah, I'm [UI]. |
| CRUZ-MARTE: | Um-hm. |
| NEGRIN: | You know it. |
| CRUZ-MARTE: | [UI] |
| NEGRIN: | But you have to be careful. |
| CRUZ-MARTE: | Of course. |
| NEGRIN: | You know it, because look, what, what are you going to do, ask Stalin. |
| CRUZ-MARTE: | I don't know. [to UM1] If we want, we can leave and come back on Thursday. |
| MARTE: | [UI] |

| | |
|---|---|
| CRUZ-MARTE: | Whatever you say. |
| MARTE: | [UI] Saturday. |
| CRUZ-MARTE: | Huh? |
| NEGRIN: | Yeah, because you aren't going to do anything here. |
| CRUZ-MARTE: | What, what are you going to do, Stalin [UI], it's fine [UI]. |
| MARTE: | Coming to look for us. |
| NEGRIN: | Look,  and IU, and I- - |
| CRUZ-MARTE: | [OV] [UI] So swing by here and pick us up, then. |
| NEGRIN: | Alright. |
| CRUZ-MARTE: | Um-hm. |
| MARTE: | [in background] Or we call Pichon, if anything happens. |
| CRUZ-MARTE: | Or we call Pichon, if anything happens. |
| NEGRIN: | Alright, or if you want, call Pichon... |
| CRUZ-MARTE: | Um-hm. Okay. |
| NEGRIN: | And tell him and Maco and the guys that we are going to work on Thursday |
| CRUZ-MARTE: | Okay. |
| NEGRIN: | You know. |
| CRUZ-MARTE: | [OV] [UI] |
| NEGRIN: | No, and what you have to tell him is that, no, that we had gone to the supermarket and a patrol car stopped us. |
| CRUZ-MARTE: | I don't have to tell them anything. |
| MARTE: | [OV] [UI] nothing. |
| NEGRIN: | [OV] But he's going to ask you. |

16

| CRUZ-MARTE: | No, but I can say that the work hasn't, that the sand hasn't arrived, or something. We can make something up. |
|---|---|
| NEGRIN: | No, no, because he knows that I got something. |
| CRUZ-MARTE: | Okay. Um-hm... |
| NEGRIN: | Because I'm not going to have someone under false pretexts. If someone doesn't want to work then they shouldn't work. |
| CRUZ-MARTE: | Of course. Um-hm. |
| NEGRIN: | Whoever doesn't want to work then they shouldn't work. Because I'm not going to have someone under false pretexts. |
| CRUZ-MARTE: | Of course. |
| NEGRIN: | That way things are clear. |
| CRUZ-MARTE: | Of course. |
| NEGRIN: | So as for Pichon, you go and tell him that, it was that we had gone to the supermarket and then for a little drive and that later on a car stopped us because of the tinted windows. |
| CRUZ-MARTE: | [OV] Yeah, faggot. |
| NEGRIN: | [OV] And [UI] of them. |
| CRUZ-MARTE: | Okay. |
| NEGRIN: | And since there's work already made, there's no need to work by force. |

Based on my training and experience, and knowledge of this investigation, I believe NEGRIN calls MARTE believing that he is with CRUZ-MARTE. NEGRIN then asks MARTE to put CRUZ-MARTE on the phone, which he does. NEGRIN tells CRUZ-MARTE that he has been at the house since 6 a.m. Your affiant knows, based on e-911 precision location information that NEGRIN is referring to his heroin stash/bagging house at 1339 Robbins Street in Philadelphia. NEGRIN and CRUZ-MARTE discuss the police stop and how it was a little strange because the

17

patrol car came out of nowhere. NEGRIN then tells CRUZ-MARTE that they have food so there is no need to force themselves to work. NEGRIN then clarifies saying they have 1500 left up there so they can wait until Thursday. Your affiant believes that NEGRIN and CRUZ-MARTE are trying to figure out whether they should begin bagging the three kilograms of heroin that NEGRIN received the day before. NEGRIN is nervous because of the car stop and tells CRUZ-MARTE that they still have 1500 bundles left from the old product and that should last them until Thursday. Ultimately, NEGRIN tells CRUZ-MARTE that he and MARTE should return to New York and come back Thursday to bag up the three kilograms of heroin then.

13. Based on e-911 precision location information for both MARTE and CRUZ-MARTE's phones, your affiant knows that MARTE and CRUZ-MARTE returned to New York and then came back to Philadelphia on Thursday, November 15, 2018. Both MARTE and CRUZ-MARTE were inside 1339 Robbins Street from the morning of November 16, 2018 to the evening of November 20, 2018. From calls intercepted over NEGRIN's phone, your affiant knows that MARTE and CRUZ-MARTE, as well as several other individuals, have been in 1339 Robbins Street bagging up the three kilograms of heroin that NEGRIN obtained on November 11, 2018.

14. On November 20, 2018, at approximately 6:52 p.m., agents intercepted a call between NEGRIN and CRUZ-MARTE.[4] During the call, NEGRIN tells CRUZ-MARTE that he saw a black van with people inside and that CRUZ-MARTE and the others should leave everything as is and exit out the front door and walk away. Shortly after this call, surveillance units observed several men exit the front of 1339 Robbins Street and walk away from the residence. Your affiant believes that NEGRIN was on his way over to 1339 Robbins Street when he observed a vehicle he

---

[4] This call was entirely in Spanish. An FBI linguist monitored this call and provided a written summary of the call.

suspected to be law enforcement. NEGRIN then called CRUZ-MARTE and instructed him to have all the baggers leave 1339 Robbins Street and to leave the heroin behind.

15. On November 20, 2018, at approximately 9:12 p.m., agents intercepted a call between NEGRIN and CRUZ-MARTE. NEGRIN asks where CRUZ-MARTE and the other baggers are and whether or not they are headed to the basement. CRUZ-MARTE tells NEGRIN they are on their way to the basement. NEGRIN then tells CRUZ-MARTE that he will meet them at the basement and that he picked up the "little gray van…the one here by the corner," so he could leave what's there and see how he could take out what was done. Your affiant believes, based on previously intercepted calls on NEGRIN's line as well as physical surveillance, that when NEGRIN and CRUZ-MARTE reference the basement they are referring to the basement apartment at 3934 K Street, Philadelphia, PA. Your affiant also believes that NEGRIN tells CRUZ-MARTE that he picked up the gray KIA Sol that was parked on the 1300 block of Stirling Street in Philadelphia, one block away from 1339 Robbins Street. Just prior to this intercepted call, surveillance units in the vicinity of 1339 Robbins Street observed NEGRIN's gray silver KIA Sol pull out of a parking spot on Stirling Street and leave the area. Not long after the intercepted call, surveillance units observed the gray KIA Sol parked behind 3934 K Street. Your affiant believes that NEGRIN was worried about law enforcement presence in the area of 1339 Robbins Street and as a result transported heroin and/or money in the gray KIA Sol to 3934 K Street. He also told CRUZ-MARTE that he had to figure out a way to "take out what is done." Your affiant believes that NEGRIN is referring to the heroin that was already bagged up inside of 1339 Robbins Street.

16. On November 20, 2018, at approximately 11:10 p.m., NEGRIN exited the rear basement of 3934 K Street, got into the gray KIA Sol, and pulled off heading northbound. Philadelphia Police Department marked units stopped NEGRIN as he left the area for investigative

19

purposes. Immediately after Negrin was stopped for investigative purposes TFO Domico notified Supervisory Special Agent Milligan that Negrin was stopped. At that point FBI C3 executed the search warrant at 1339 Robbins Street. Recovered from NEGRIN at that time were three cellular telephones.

17. At approximately 11:30 p.m., FBI Squad C3 and members of the Philadelphia Police Department executed a local search warrant at 3936 K Street and a consent search at 3934 K Street. Agents obtained written consent to search 3934 K Street after executing the search warrant at 3936 K Street. During the execution of the search warrant at 3936 K Street, agents learned that MARTE, CRUZ-MARTE, Noel ARIAS and Christian ARIAS were in the basement apartment of 3934 K Street. Written consent to search the basement apartment of 3934 K Street was obtained from Yineida Reyes, the daughter of the owner of the residence. Reyes provided your affiant with a key for the apartment.

18. Upon entry into 1339 Robbins Street, agents discovered an empty apartment that appeared to be a heroin bagging location. There was a long fold-up table in the middle of the room with heroin and heroin packaging material on it. Recovered from on and around the table in 1339 Robbins Street was approximately two and a half kilograms of heroin, approximately half of which was bagged up and packaged for sale. The evidence was collected and a sample of the heroin was field tested and tested positive for the presence of heroin.

19. Upon entry into 3934 K Street, agents encountered four individuals, MARTE CRUZ-MARTE, Noel ARIAS and Christian ARIAS, in the rear room of the basement apartment. As agents instructed all four men to get down on the ground, Noel ARIAS ran to the very back of the room and appeared to be attempting to wedge himself into a narrow opening in the wall. After securing Noel ARIAS, agents discovered two brick like objects on the ground in the opening in

20

the wall that Noel ARIAS had been attempting to wedge himself into. Agents recovered the two brick like objects, which were later weighed and field tested and turned out to be two kilograms of fentanyl. In addition to the two kilograms of fentanyl, agents recovered four and a half kilograms of heroin, two handguns hidden in the ceiling tiles in the apartment and multiple cellular telephones. The heroin was later field tested and tested positive for heroin. MARTE, CRUZ-MARTE, Noel ARIAS and Christian ARIAS were all arrested.

20.     The Devices are currently in the lawful possession of the Federal Bureau of Investigation. They came into the Federal Bureau of Investigation's possession in the following the traffic stop and subsequent arrest of Roberto DeJesus NEGRIN on November 20, 2018, by the Philadelphia Police Department. Following his arrest, law enforcement recovered each of the cell phones from NEGRIN's person.

21.     The Devices are currently in storage at Federal Bureau of Investigation, Philadelphia Division, Evidence Control Room. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the Federal Bureau of Investigation

## TECHNICAL TERMS

10.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

11.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.samsung.com. I know that these Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used those devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

12.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on those devices. This information can sometimes be recovered with forensics tools.

22

13.	*Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on these Devices because:

> a.	Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

> b.	Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

> c.	A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

> d.	The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

15. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

16. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

17. Based on my training and, I know that individuals involved in drug trafficking often maintain more than one phone or more than one SIM card device, in order to have multiple avenues to facilitate drug trafficking activities, and in an attempt to avoid detection by law enforcement. I am aware that individuals involved in drug trafficking and often times utilize pre-paid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of third person, in order to mask their direct linkage to telephones utilized in furtherance of drug trafficking activities. Further, those involved in drug trafficking often change SIM cards in order to make it difficult for law enforcement to determine their records. Based on my training and experience, I know that individuals involved in drug trafficking also frequently switch telephone numbers and/or phones. Despite the constant switching of active telephone numbers, drug traffickers often keep old phones.

18. Based on my training and experience, I know that drug traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their drug transactions. For example, I know that drug traffickers often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their drug trafficking activities. Here, in this case, I know that NEGRIN used various cellular telephones to communicate with co-conspirators to facilitate, plan, and execute drug transactions.

19. Specifically, I know that those involved in drug trafficking communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in drug trafficking communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

20. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. I am aware that drug traffickers frequently list drug associates in directories, often by nickname, to avoid detection by others. Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) being used by specific traffickers.

21. In addition, I know that those involved with drug trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators. I am also aware that drug traffickers often take photographs or make videos of drugs and drug proceeds with their cellular telephones and tablets. Based on my training and experience, those

26

who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

22.     Furthermore, based on my training and experience and the training and experience of other agents, I know that drug traffickers often use a cellular phone's Internet browser for web browsing activity related to their drug trafficking activities. Specifically, drug traffickers may use an Internet search engine to explore where banks or mail delivery services are located, or may use the Internet to make reservations for drug-related travel. In addition, I know that drug traffickers also use their cellular telephone's Internet browser to update their social networking sites in order to communicate with co-conspirators, and to display drugs and drug proceeds or to post photographs of locations where they have traveled in furtherance of their drug trafficking activities.

23.     In addition, drug traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their drug trafficking activities. These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located.

24.     Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by

27

members of the conspiracy. In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

25. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Anthony J. Ilardi
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on January 24 16 2019:

The Honorable David R. Strawbridge
UNITED STATES MAGISTRATE JUDGE

28

## ATTACHMENT A

The properties to be searched are a SAMSUNG GALAXY NOTE 9, INTERNATIONAL

MOBILE EQUIPMENT IDENTITY (IMEI) 356568090054491; SAMSUNG GALAXY S8,

IMEI 355987080841710; SAMSUNG GALAXY S9, IMEI 354824090452520 , hereinafter the

"Devices." The Devices are currently located at the Federal Bureau of Investigation,

Philadelphia Division, Evidence Control Room.

This warrant authorizes the forensic examination of the Devices for the purpose of

identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.    All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 and involve Christian De Aza ARIAS, Noel DE AZA ARIAS, Francisco CRUZ, and Stalin De Jesus MARTE including:

    a.  lists of customers and related identifying information, including contact phone numbers and email addresses;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.  any information related to the methods of trafficking in narcotics;

    e.  photographs of associates, co-conspirators, and other evidence of drug trafficking;

    f.  any information recording domestic and international schedule or travel;

    g.  any and all information related to credit card bills, account information, and other financial records, including but not limited to, accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence;

    h.  any and all information related to identification records, including but not limited to applications for birth certificates, state identification cards, social security cards, and driver's licenses;

    i.  any and all banking information, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts,

1

money orders (blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit boxes, money wrappers and wire transfers;

j.  any and all information relating in any way to the possession, sale, purchase, transfer, and./or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved; and

k.  stored electronic information and communications, including but not limited to, telephone or address directory entries consisting of names, addresses and telephone numbers, schedule entries, photographs, audio, and video. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted. such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2